HAWLEY v. PROFESSIONAL CREDIT BUREAU, INC.

1. LIBEL AND SLANDER—BAD FAITH—COLLECTION OF DEBT—LETTER TO EMPLOYER.

Plaintiff, in action for libel, to whose employer defendant local credit bureau and its manager wrote a letter to enlist cooperation in securing payment of money to an out-of-town creditor which had referred the account for collection, failed to make any showing that defendants were acting in bad faith in believing plaintiff owed the debt, where, over at least a 6-months' period, plaintiff had refused to make any payments upon it and had not denied the debt to the creditor, such failure being corroborated by failure to object within a reasonable time to statements rendered to him.

2. ACCOUNT STATED—CONVERSION OF OPEN ACCOUNTS.

The conversion of an open account into an account stated is an operation by which the parties assent to a sum as the correct balance due from one to the other, and although it may still be impeached for fraud or mistake, in the absence of such impeachment, it serves in place of the original account as the foundation of an action.

REFERENCES FOR POINTS IN HEADNOTES

[1] 33 Am Jur, Libel and Slander §§ 59–61, 112, 119.
[2] 1 Am Jur, Accounts and Accounting §§ 16, 30, 31.
[3] 33 Am Jur, Libel and Slander § 280.

3. LIBEL AND SLANDER—COLLECTION OF DEBT—LETTER TO DEBTOR'S EMPLOYER.

Circumstances which led to credit bureau's writing of a letter to plaintiff's employer to enlist cooperation in payment of $21.98 owing an out-of-town creditor, which represented the balance of an account upon which plaintiff had made payments after receiving a favorable adjustment *held*, not to have constituted an invasion of plaintiff's right of privacy nor to have disclosed a basis for plaintiff's claim of libel or malice, especially where plaintiff ignored repeated statements and had not denied the debt to the creditor during period of 6 months following the making of the last payment.

SMITH and BLACK, JJ., dissenting.

Appeal from Muskegon; Fox (Noel P.), J. Submitted January 4, 1956. (Docket No. 26, Calendar No. 46,648.) Decided May 14, 1956.

Case by Fred Hawley against Professional Credit Bureau, Inc., a Michigan corporation, and Carl F. Funnell, for damages for invasion of right of privacy by reason of collection effort in form of letter to his employer. Verdict and judgment for plaintiff. Defendants appeal. Reversed and remanded for entry of judgment for defendants.

*Alexis J. Rogoski* and *Robert Bunker Rogoski,* for plaintiff.

*Stribley & Rude* (*Arthur M. Rude,* of counsel), for defendants.

REID, J. Plaintiff brought this suit because of the writing of a certain letter attributable to both defendants, written to the director of a junior college, the employer of plaintiff. As claimed by plaintiff, the letter imputes dishonesty to plaintiff, is libelous per se, and was presumably prompted by malice. The plaintiff claims the letter is actionable for having unlawfully invaded the plaintiff's right of pri-

vacy, and plaintiff claims that the letter was written in furtherance of a threat by collection agency defendant twice made to destroy plaintiff's credit. From a judgment against them of $2,000, defendants appeal.

The letter captioned at defendant credit bureau's office in Muskegon, Michigan, is as follows:

"October 13, 1951

"Asst. Director of Junior College
  Hackley School Building
  Muskegon, Michigan
"Re:
  Your Employee: Fred Hawley
      Owing      Silver Moving & Storage $21.98
                 since 3–5–51
*"Dear Sir:*

"The above individual has been given every reasonable opportunity to pay or make satisfactory arrangements. Failure to do so justifies collection by legal action. This will, of course, bring additional expense upon your employee and inconvenience you as garnishee defendant. We would like to prevent both.

"We therefore suggest that you confer with this debtor to secure cooperation to that end. If the individual's resources will not permit payment in full, we suggest payroll deductions to provide assurance of regular remittance to this office. Payments of $5.00 or more per week are acceptable.

"Your help to avoid suit will be appreciated.

                    "Sincerely,
                    "/S/ C. F. FUNNELL
                    "C. F. Funnell,
                    "Manager"
"Member of Michigan Association of Collection
  Agencies,
"Muskegon Merchants Service Bureau and Commercial Law League."

The facts which caused the writing of the letter are as follows:

Plaintiff and his wife lived at Alpena, Michigan, for several years prior to 1946, when they moved to Muskegon. Before leaving Alpena, plaintiff stored his furniture with Silver Moving & Storage Company at Alpena at an agreed-on storage rate. The furniture remained in storage until July 11, 1950. In June, 1950, plaintiff wrote Silver Moving & Storage Company a letter from Muskegon which, among other things, contained the following:

· *"Gentlemen:* Undoubtedly you have trips coming down in this vicinity. What would it cost to transfer our furniture here during one of these trips?"

On July 8, 1950, Silver sent the following telegram to plaintiff at Muskegon:

"Plan to deliver your furniture Tuesday, July 11. Wire collect if O.K. R. G. SILVER."

This telegram was not received by Mrs. Hawley until just before the furniture arrived in Muskegon. Plaintiff Mr. Hawley was at Bay View teaching in a summer college. On July 11, 1950, the furniture arrived in Muskegon and was delivered to plaintiff's address. The driver presented a bill for the balance of storage and transportation charges of $89.48. Mrs. Hawley paid $30 on the bill and reluctantly accepted the furniture. This left a balance of $59.48. On October 2, 1950, plaintiff wrote Silver Moving & Storage Company a letter complaining about the charges for moving the furniture and as a result obtained an adjustment on the bill of $12.50, which reduced the unpaid balance of the bill to $46.98. At different dates following this adjustment, plaintiff paid a total of $25 on the bill, leaving a balance of $21.98, and then plaintiff discontinued his payments. During 1951, after such discontinuance, plaintiff re-

ceived bills from Silver Moving & Storage Company requesting payment of the $21.98. Some time in September or October, 1951, plaintiff received a telephone message from defendant Professional Credit Bureau, Inc., saying they had a bill from Silver Moving & Storage for $21.98. During 6 months in 1951, in which he received various statements, plaintiff did not in anywise let Silver know that he claimed not to owe the $21.98 or any part of it.

This is not a suit against plaintiff's creditor but against the collection agency. The determinative question in the case is, was the writing of the letter hereinbefore set forth a violation of any right of plaintiff respecting privacy?

Plaintiff testified on cross-examination as follows:

"*Q.* And that left a balance, then, of $46.98, did it not?

"*A.* I presume that would be it.

"*Q.* All right, then, now that's the balance as of November 1, 1950. Now, during November, 1950; January, 1951; February, 1951; and March, 1951, you paid a total of $25 on the bill, did you not?

"*A.* That's right.

"*Q.* And you testified on direct examination that there was no communication between you and Silver Moving & Storage about the declining balance on your bill, you didn't write them or phone them, or tell them you weren't going to pay the balance, did you?

"*A.* No, I didn't.

"*Q.* You just continued to pay on the bill. Now, deducting the $25 you paid on the $46.98, left a balance of $21.98.

"*A.* That's right.

"*Q.* That was the status of the account as of March, 1951, is that right?

"*A.* That's right.

"*Q.* Then you discontinued your payments, didn't you?

"*A.* That's right.

"*Q.* But you didn't write Silver Moving & Storage, or the Alpena Credit Bureau, that you were discontinuing your payments, and that you refused to pay the balance of $21.98, did you?

"*A.* No, sir.

"*Q.* You just ignored it, didn't you?

"*A.* That's right, yes.

"*Q.* All right, now we are in 1951, and the bill is $21.98. This is a year after they delivered the furniture to Muskegon, isn't it?

"*A.* That's right.

"*Q.* Now, April, 1951, went by, May, June, July, August, and September, and during that time you received bills from Silver Moving & Storage, for this $21.98?

"*A.* I presume so—not regular.

"*Q.* Not regular bills, but you received some bills during that 6-months' period for that $21.98?

"*A.* That's right.

"*Q.* And you ignored all the bills?

"*A.* That's right.

"*Q.* Then, in September, or October, 1951, you received a call from Professional Credit Bureau, as you just testified, saying that they had a bill from Silver Moving & Storage, for $21.98, is that right?

"*A.* Which call?

"*Q.* I'm talking about the first telephone call to you.

"*A.* That's right, yes.

"*Q.* Was that received at your home or at your office?

"*A.* At my home.

"*Q.* And you—and that telephone call was as a result of this post card which has been offered in evidence?

"*A.* That's right.

"*Q.* Now, up to this point, you have not communicated to Silver Moving & Storage, or the Alpena Col-

lection Service, or the Professional Credit Bureau, your counterclaim for damages, have you? You haven't communicated to them about that up to this point—that is, up to the time you got this phone call?

"*A.* No, I haven't.

"*Q.* You have been carrying that around in your own mind all this time, nobody else knew about that claim, did they?

"*A.* No, I don't know whether you want to call that a counterclaim or not.

"*Q.* We will get to that shortly, but at least, you haven't made any claim back against Silver Moving & Storage up until the time you got the card from Professional Credit Bureau, did you?

"*A.* That's right.

"*Q.* So the Silver Moving & Storage, and the Alpena Credit Bureau, had no way of knowing that you didn't owe the $21.98, did they? They had no way of knowing that, because you just said you didn't tell anybody, is that right?

"*A.* That's right."

Plaintiff made no showing that defendants were acting in bad faith in believing that plaintiff owed the debt. Over at least a 6-months' period he had refused to make any payments upon it, and had not denied the debt to the creditor, Silver.

Plaintiff's testimony, as above quoted, is corroborated by his failure to object within a reasonable time to statements rendered to him. See *Pabst Brewing Company* v. *Lueders,* 107 Mich 41; *Raub* v. *Nisbett,* 118 Mich 248; *Joslin* v. *Cook,* 341 Mich 236, 241.

"The conversion of an open account into an account stated, is an operation by which the parties *assent* to a sum as the correct balance due from one to the other. * * * The parties may still impeach it for fraud or mistake. But so long as it is not impeached, the agreed statement serves in place of

the original account, as the foundation of an action."
*White* v. *Campbell,* 25 Mich 463, 468.

Plaintiff states in his brief, "The letter imputes dishonesty to plaintiff, is libelous *per se,* and was presumably prompted by malice." Such can be the case only if the nonpayment by plaintiff was dishonest; hence, the question of law for us to determine is, was the nonpayment by plaintiff a matter of such nature that he was entitled by law to require all people that knew of it to say nothing about it? The writing of the letter sued on as libelous was the invasion of no right of privacy of plaintiff. Defendants gave no unnecessary publicity to plaintiff's conduct. Plaintiff made no statement in his brief of inability to pay the debt on terms offered him.

From plaintiff's own testimony, the account at one time was agreed on as correct, after a reduction in the amount; several payments were made by him on the account as thus agreed on; for about 6 months after the last of such payments, statements of the account agreed on as thus reduced, were rendered to plaintiff by the creditor; plaintiff did not make denial at the time of any of those statements to plaintiff. Our attention is also directed to *Larsen* v. *Stiller,* 344 Mich 279, 288, 289.

The letter complained of shows that defendants had been informed of the history of the account between plaintiff and Silver, which history shows facts which would inevitably lead defendants to consider that there was honestly owing to Silver the debt the account for which the defendants had received for collection. The circumstances leading up to the writing of the letter complained of, do not show a basis for plaintiff's claim of libel and malice. This suit is over the sending of the letter and not a suit

involving the amount actually due on the account between plaintiff and Silver.

The trial court was in error in denying defendants' motion for a judgment notwithstanding the verdict and in submitting the case to the jury and in entering judgment upon the verdict. Judgment for plaintiff is reversed. The case is remanded to the trial court with instructions to enter judgment for the defendants of no cause of action. Costs to defendants.

DETHMERS, C. J., SHARPE, BOYLES, KELLY, and CARR, JJ., concurred with REID, J.

SMITH, J. (*dissenting*). This case turns on a certain letter, described by my Brother. The letter, from the defendant Professional Credit Bureau, Inc., to plaintiff's employer, informed the latter that the plaintiff had been given "every reasonable opportunity to pay" a bill of $21.98. It extended "to the employer the common decency" of notifying him of the debt. It suggested a "conference" of the employer with the debtor. (It was also suggested that "payroll deductions" might be made to liquidate the debt. Five dollars a week, or more, would be acceptable.) In all of this, urge defendants, this Court is to find no hint of coercion, no odor of duress, nothing but friendliness and good fellowship. The solicitude of the letter, it is said, is obvious from its language. It is stressed to us that "there are no threats here; no demands that he be fired, no demands that he 'pay or else.'" So far as the employer is concerned, it merely wishes to avoid his "inconvenience."

It is true that we are blessed, in our society, with the occasional companionship of generous and kindly souls who wear robes of altruism with dignity and sincerity. Their solicitude for others is manifest in their good works. Is this the company in which we

find the defendant Professional Credit Bureau?
Such seems to be its position.   Plaintiff's remon-
strance, that the mailing of such a letter to his em-
ployer was "unwarranted," meets with defendants'
ready rejection.   And why?   Because, assert de-
fendants, in part, it would "prevent the creditor from
extending to the employer the common decency to
notify him of the debt and the possibility of suit and
garnishment, which is all the creditor did in the in-
stant case."

We would be the more inclined to accept the letter
as merely an illustration of the collection bureau's
common decency, as urged, however, were it not for
an omission which has significance to us:   The letter
is completely silent as to the fact that the alleged
debtor was vigorously contesting the debt, as was
well known both to the creditor (defendant collection
bureau) and its agent, at the time the letter was
written.   The common decency urged upon us would
seem to include, as well, common decency extended to
the employee.   It would seem to involve, at the very
least, some simple acknowledgment that the em-
ployee had protested time and again that he owed
nothing.   Without it, indeed, the employer might be
misled as to his employee's sense of financial respon-
sibility.

This silence, in fact, leads to another construction
of the letter:   Is it conceivable that common decency
was not the real motive for sending the letter?   Was
the letter, in truth and in fact, "issued with the in-
tention of invoking his (employer's) influence and
control over plaintiff (debtor) as a means of forcing
the latter, through fear of discharge or otherwise, to
liquidate the small balance of his indebtedness to
it?" (*Quina* v. *Roberts* [La App], 16 So2d 558, 561.)
So the plaintiff asserts.   And such has, regrettably,
been the effect of similar letters.   The chief clerk of
a Nebraska power company (*LaSalle Extension Uni-*

*versity* v. *Fogarty,* 126 Neb 457 [253 NW 424, 91 ALR 1491] ) received such a letter concerning one of the employees. His reaction was definite and unequivocal: he talked with the defendant. (This, apparently, is the "conference" suggested in the letter in the case before us.) What was said was clear and to the point, unembellished with equivocation or solicitude (p 460):

" 'Our company wasn't having men working for us who had their salaries garnisheed, and if in case he had anything like that, we would have to do one thing or the other, either pay the bills or have to dismiss him.' "

The syllabus well states the result of the jury trial:

"Threats to sue and to appeal to one's employer, made wilfully and intentionally, for the purpose of producing mental pain and anguish, in attempting to collect a debt, *held* to authorize recovery for mental pain and suffering, though no physical injury results."

(We note, in the case before us, allegations that the letter was written "deliberately, maliciously, and intentionally" and "for the purpose of threatening plaintiff and coercing him [plaintiff] to make payment.")

If defendant Funnell be surprised, after 17 years as manager of defendant Professional Credit Bureau, at such unexpected employer reaction to a courteous and friendly letter, sent merely to avoid the employer's inconvenience, we are constrained to point out that the lawbooks and legal periodicals describe in much detail other cases where, regrettably, similar employer reaction has taken place upon the receipt of such a letter. The tactic is, in fact, so efficacious as a collection device that it is one of the standard collection methods of usurious lenders, their *modus operandi* being well described

in an article in 8 Law and Contemporary Problems,. pp 78, 83.

"A collection letter may threaten to jeopardize the borrower's job by enclosing a copy of a postdated letter addressed to the victim's employer. The borrower is warned that if he does not pay, the original of the enclosed letter will be sent to his employer. When a lender does write to a company official about an employee's delinquency, nothing is said of the nature of the obligation. The appeal is to the employer's fairness in helping to collect a just debt. The lender will write:

" 'If it is not an intrusion upon you we would greatly appreciate it if you take this matter up with this party relative to effecting a settlement.  *  *  * It is only because this man has failed to comply with the terms of his contract that we appeal to you.'

"The employer does not know that this creditor's 'grievance' is based on a loan at 240% interest or more. The company wants its employees to meet their obligations. The lenders know that many wage earners are reluctant to discuss personal affairs with their superiors and will not burden company officials with stories of their troubles.

"A public utility company official who received a lender's appeal for assistance took the very action the lender wanted. The official wrote the employee,. telling him about the letter received, and concluded, 'You appreciate that the officials of this company do not want such matters to reach them and it will be to your interest to settle the matter in some manner without having it reach the company officials again.' "

Our jurisdiction and our people have not been free of these problems. "The City of Detroit has had more than its share of the problem of the small debtor," writes Nugent, in a careful study of "Devices for Liquidating Small Claims in Detroit" in 2 Law and Contemporary Problems, p 259. He continues, with respect to the problem now before us (p 260):

"Garnishment caused hardship to the debtor not only because it left him with an inadequate allowance to support his family, but also because it was extremely expensive and frequently led to his dismissal. * * * The largest employer of labor in Detroit maintained a rule (to which frequent exception was made, however,) that employees whose wages were garnished should be immediately discharged. Although it was unusual for other employers to discharge for a single garnishment, many considered a second or third garnishment to be sufficient ground for dismissing an employee."

So much for the bare contents of the letter. But in order that its ambiguities be construed and its true purport ascertained it is necessary to consider in detail the circumstances surrounding its dispatch. The letter did not stand alone as a collection device. In supplementation and addition to the facts outlined by my Brother REID we must advert to the entire course of action followed by defendant corporation. Some of the facts here set forth were controverted. However, "in determining whether the verdict is supported by the evidence, the evidence must be construed most favorably to the appellee, and evidence favorable to the appellee must be accepted as true. The appellee is entitled to the benefit of every possible inference that may be drawn in his favor from the evidence, and evidence which is inconsistent with or contrary to the evidence favorable to the appellee must be disregarded." 2 MLP, Appeal, § 338, pp 226, 227.

Plaintiff's first contact with the defendants was in October of 1951. In response to a post card, signed by a "Mrs. Sweet," plaintiff called a certain number. He was then told that, "We have a bill for $21.98 against you, and we would like to receive payment." The plaintiff replied that he did not owe the bill. There was no further conversation at this time. But

apparently defendant credit bureau was either unconvinced or uninterested. The next call (time and date not fixed, but subsequent to the above) was another demand for payment, and again plaintiff protested that he did not owe the bill. In addition he explained the trouble. The reason he didn't owe the bill, he said, was because of the unauthorized shipment of the furniture. Again there was disinterest. "We don't care about that part," he was told, "what we're concerned with is the $21.98 which they claim you owe." It was during this conversation, also, that defendant bureau inquired of plaintiff: "You don't want to jeopardize your credit rating, do you?"

It was at or about this time that the credit bureau called plaintiff's wife at her place of business. "I had just went to work on a new position, and my boss called me to the telephone, that the Professional Credit Bureau was on the line and wished to talk to me, and I said, 'I don't understand, I don't owe anybody anything,' and he said, 'Pay your bill and you won't get these calls.'"

The last call received by plaintiff was answered by his wife, who, after being asked certain questions, not set forth in the record, stated, "Well, just a moment, Mr. Hawley is right here, I'll let you talk to him." Plaintiff took the phone "and said 'Hello' and there was a click, and I said 'Hello' several times, but the party hung up." The letter to plaintiff's employer followed.

There is no need, in this opinion, to undertake a lengthy exposition of the right of privacy, of the growth of the law from those ancient days when only a physical battery found redress in the courts, when gross and evil assaults upon the spirits and emotions of our people went without recovery. That the right of privacy exists in this jurisdiction was settled beyond doubt by the case of *Pallas* v. *Crowley, Milner*

& Co., 322 Mich 411. See, also, Plant, "The Right of Privacy in Michigan," 33 MSBJ 8 (March, 1954). The right, as Dean Prosser points out (The Law of Torts [2d ed], § 97, p 635), is a complex. It involves not only the right against appropriation of some elements of plaintiff's personality for commercial use (the *Pallas Case*) but also the right against the disclosure of private information concerning the private life of a private citizen in violation of the common decencies, such as the publication of a picture of one's deformed child (*Bazemore* v. *Savannah Hospital*, 171 Ga 257 [155 SE 194] ), the details of an humiliating illness (*Barber* v. *Time, Inc.*, 348 Mo 1199 [159 SW2d 291] ), or the fact that he has not paid his debts (*Brents* v. *Morgan*, 221 Ky 765 [299 SW 967, 55 ALR 964]). The common denominator in all of these cases is an unreasonable and serious interference with the plaintiff's interest in not having his affairs known to others. 4 Restatement, Torts, § 867. The wrong depends not upon conduct otherwise tortious (*i.e.*, trespass, defamation) nor does it turn upon breach of confidence, or truth or untruths, or an arithmetical measure of the numbers who witnessed the exposure, or the particular method thereof, whether by placard (*Brents* v. *Morgan, supra*) or by letter (*LaSalle Extension University* v. *Fogarty, supra*). The wrong is done when the curtain of privacy is lifted.

The problem presented in the collection cases is considerably older than the theory upon which recovery is here sought. (See Warren and Brandeis, "The Right to Privacy," 4 Harvard LR 193; see, also, Justice Cooley's enunciation of the "right to be let alone," found in his "Treatise On the Law Of Torts" [1879], p 29). How far may a creditor go in the collection of his debt? The time is not long distant when imprisonment for debt was commonplace. It has been said (98 U Pa LR 230, 232) that during

the period of its employment, until around 1830, from 3 to 5 times as many persons were imprisoned for debt as for crime, and most of the sums involved were, as in the case before us, very small. The wave of reform which abolished such practices has resulted, with few exceptions, in the abolition of the criminal sanction. The civil remedies, of course, remain, at the other extreme. But between the 2 poles is a vast shadowland of doubt and uncertainty. How far may a creditor, for the purpose of collecting his debt, go in exposing his debtor to public contempt and humiliation? How much extra-legal pressure may be applied? May he go to the debtor's pastor, to his employer, to his neighbors, to all whose esteem is important, to those forming the inner circle of his spiritual defenses, and expose the debtor's alleged disregard of his obligations? May the creditor, to them, complain that the debtor owes him $21.98 and has doggedly refused to pay although "he has been given every reasonable opportunity to pay or make satisfactory arrangements"? That he is, in short, either a deadbeat, or broke, or both?

I say not. He may request payment. He may demand payment. He may, also, sue the debtor, in which case both parties will have their day in court, and, in this regard, we note that the disputed obligation here involved was eventually sued upon and "settled out of court." The creditor also has his garnishment remedy, in which event a feeble measure of statutory safeguards is available to the debtor. But he may not invade his privacy for the purpose of coercing him into payment of the debt by the device of exposing his private affairs to others, either to his employer, for whatever action the latter may see fit to take, or to the public at large. He may not subject the debtor to the duress of purchasing a cessation of public humiliation, or employer pressure, by payment. It is true that we live in a credit

economy. But when one of our people buys a refrigerator on time, he does not thereupon hang the vestments of his privacy in the creditor's closet, to stand naked and exposed to whatever measures the creditor chooses to employ to collect the debt.

We need not elaborate upon the cases argued to us. Relief from improper collection methods is obtained through various legal theroies, some of which find expression in the cases cited to us. See, generally, 66 US LR 349, "High Pressure Collection Methods;" 31 N Dakota LR 277. A violation of the right of privacy is often asserted, as in the case before us, with or without elements of defamation and libel. The words of the Louisiana court, in the case of *Quina* v. *Roberts, supra* (a similar case in which the creditor had written the employer a letter, enclosing with it a simulated legal process entitled, "Final Notice Before Suit") are in point. The letter read, in part, as follows (p 559):

"Any assistance you might offer which would enable us to withhold such drastic action against this party in order to make him realize the necessity of taking care of his just obligations will be greatly appreciated."

In reversing judgment for defendants the court held (p 560):

"But whatever be the sound rule at common law respecting the libelous character of publication of this kind, it is manifest to us that the issuance of the letter and enclosure in this case, for the obvious purpose and design of forcing a payment by plaintiff, constituted a tort under our law and that plaintiff is entitled to redress even though he was unable to prove special damage. And it makes no difference whether the publication is considered to be libelous or not. It is well settled, even in the common law States, that damages will be allowed for mental anguish suffered by a debtor in cases where the credi-

tor has pursued unseasonable [unreasonable?] methods in attempting to make collection of his claim. See 33 Am Jur, Libel and Slander, § 61, pp 79 and 80, 41 Am Jur, Privacy, § 30, p 947, and a comprehensive note contained in 91 ALR 1495, entitled 'Mental Anguish due to Collection Methods.' These authorities which are supported by cases from several States, reveal that, while it is doubtful that writings like the one in the instant case are libelous, yet they are classed as torts for which recovery may be had without proof of particular damage. In some cases, relief has been granted on the ground that the publications were libelous and in others on the ground that there had been an invasion of the plaintiff's right of privacy."

With particular reference to the purpose of the letter the court spoke as follows (p 561):

"An examination of the letter sent by defendant to Mr. Gillman, together with the enclosure therein, is sufficient to warrant the conclusion that it was issued with the intention of invoking his influence and control over the plaintiff as a means of forcing the latter, through fear of discharge or otherwise, to liquidate the small balance of his indebtedness to it.    *    *    *

"Plaintiff testified that the publication caused him humiliation and mental anguish and we can well believe that such was the case. The fact that he was in dire financial circumstances does not diminish the damage done him by the attempted and unwarranted use of the influence of his employer as a club over him to enforce payment of the paltry sum which defendant concedes is the balance due on the debt."

*Per contra,* we are referred to certain cases in which it is said that the employer may properly be told of such debts because he has a legitimate interest in the matter, since a debt-free employee is a a more efficient employee. The argument proves too much. A love-sick employee, also, is far from effi-

cient. Should we call upon the boss to scotch the romance? What we are looking at, in essence, is simply a matter of human dignity, the right to live our own lives without the meddlesome interference of others, the simple right to be let alone. We can be sued for our debts. In event of default, that we may expect. Wages may be garnisheed. We can be made subject to the execution of legal process and our property seized. The creditor's arsenal is both ample and effective as respects this type of small debtor. We will not add to these weapons the right to "have the heat put on" in the front office, in short (to revert to legal phraseology) the right to invade privacy. It is clear to us on the facts presented (and as must have been found by the jury) that there has been an attempt to collect this debt by means of duress and coercion, in violation, not in furtherance, of the common decencies, and there has been, as well, an unreasonable and serious interference in plaintiff's interest in not having his affairs known to others.

Judgment should be affirmed. Costs to appellee.

BLACK, J., concurred with SMITH, J.