BEAUMONT v BROWN

(BEAUMONT v DIRECTOR OF DEPARTMENT OF LABOR)

1. JUDGMENT—SUMMARY JUDGMENT—MOTIONS—COURT RULES.

A motion alleging that the complaint fails to state a legally sufficient claim or cause of action upon which relief can be granted will be treated as a motion for summary judgment on the ground that except as to the amount of damages there is no genuine issue as to any material fact, and the moving party is therefore entitled to judgment as a matter of law, where the trial judge made his decision based on factors relevant only to a motion on the latter ground, and where there is no prejudice to either party (GCR 1963, 117.2[1], 117.2[3]).

2. JUDGMENT—SUMMARY JUDGMENT—TRIAL—COURT RULES.

A trial may be avoided only if an essential element of proof of the claim or defense cannot be supplied when a summary judgment is claimed on the ground that except as to the amount of damages there is no genuine issue as to any material fact, and the moving party becomes entitled to judgment as a matter of law (GCR 1963, 117.2[3]).

3. PRIVACY, RIGHT OF—TORTS.

An individual has a right to privacy to be protected by the law of torts.

4. PRIVACY, RIGHT OF—DAMAGES—INTRUSION—PUBLIC DISCLOSURE—FALSE LIGHT—APPROPRIATION.

To recover damages for invasion of privacy a plaintiff must show one of the following: (1) intrusion upon his seclusion, solitude, or into his private affairs, (2) public disclosure of embarrassing private facts about him, (3) publicity which places him in a

REFERENCES FOR POINTS IN HEADNOTES

[1] 73 Am Jur 2d, Summary Judgment § 16 *et seq.*
[2] 73 Am Jur 2d, Summary Judgment § 26.
[3] 62 Am Jur 2d, Privacy § 3.
  Right of privacy. 14 ALR2d 750.
[4, 5] 62 Am Jur 2d, Privacy § 45.
[6, 8] 62 Am Jur 2d, Privacy §§ 7, 41.
[7] 62 Am Jur 2d, Privacy § 7.
[9] 62 Am Jur 2d, Privacy § 26.

false light in the public eye, or (4) appropriation, for the defendant's advantage, of his name or likeness.

5. PRIVACY, RIGHT OF—INTRUSION—ELEMENTS.

Intrusion as a branch of the right to privacy has three elements: (1) the existence of a secret and private subject matter, (2) a right possessed by plaintiff to keep the subject matter private, and (3) the obtaining of information about that subject matter by defendant through some method objectionable to the reasonable man.

6. PRIVACY, RIGHT OF—INTRUSION—ARMED SERVICES.

A cause of action for invasion of privacy based on intrusion does not cover giving information to the Army which is part of an employer-employee relationship and requesting information from the Army concerning an employee's reserve activities by merely writing a letter; the method is commonly used and quite reasonable.

7. PRIVACY, RIGHT OF—PUBLIC DISCLOSURE OF PRIVATE FACTS—LETTER.

Invasion of privacy based on public disclosure of private facts requires communication to the general public as opposed to a few individuals; supportive personnel of the sender and receiver of a letter do not constitute the general public or a large number of persons and proof that information in the letter was leaked to outsiders does not change the result.

8. PRIVACY, RIGHT OF—DISCLOSURE OF PRIVATE FACTS—ARMED SERVICES.

Invasion of privacy based on public disclosure of private facts does not look to whether the information conveyed is true or false, but whether it is something an ordinary person has a right to keep private; therefore, a letter sent to the Army indicating that an employee manipulated his reserve duty to his employer's detriment and submitted false health reports to either the Army or his employer does not violate the right of privacy, because the employer had a right to convey the information.

9. PRIVACY, RIGHT OF—FALSE LIGHT—DISCLOSURES.

To constitute invasion of privacy based on false light in the public eye there must be falsity or fiction concerning a person with disclosure to the general public rather than a few individuals; it applies to any falsity, which the reasonable man would find objectionable, presented to the general public.

Appeal from Ingham, Ray C. Hotchkiss, J. Submitted May 14, 1975, at Lansing. Decided November 12, 1975. Leave to appeal applied for.

Complaint by Robert A. Beaumont against Barry C. Brown, Director of the Department of Labor, and Arthur J. Zink, the department's personnel director, for damages for invasion of privacy. Defendants' motion for summary judgment was denied. Defendants appeal from that ruling by leave granted. Reversed and remanded.

*Newman & Mackay,* for plaintiff.

*Farhat, Burns & Story, P. C.,* for defendants on appeal.

Before: QUINN, P. J., and BRONSON and N. J. KAUFMAN, JJ.

BRONSON, J. Plaintiff, Robert A. Beaumont, brought suit against defendants for invasion of privacy. Defendants moved for summary judgment, but the trial judge ruled that the plaintiff raised sufficient issues as to material facts to take the case to the jury. Defendants appeal from that ruling by leave granted.

Robert Beaumont was employed as a labor safety supervisor for the Michigan Department of Labor for a number of years prior to November 20, 1972. Defendant Barry Brown was Director of the Department of Labor at that time, and defendant Arthur Zink was the personnel director. On November 20, 1972, defendant Zink discharged plaintiff upon the recommendation of plaintiff's immediate supervisor. The reasons given were as follows: (1) that plaintiff was absent from his job for a month of military reserve duty without approval

of, or conversation with, his supervisor; (2) that plaintiff made no plans for the continuation of the training of a new employee while he was gone; and (3) that plaintiff made no plans for the supervision of field personnel while he was gone.

Plaintiff appealed his dismissal to the Michigan Civil Service Commission, and hearings were held on January 31 and February 2, 1973. A final hearing was scheduled for March 1, 1973. On February 14, 1973, between the second and final hearings, defendant Zink wrote a letter to the "U. S. Army Reserve Components, Personnel and Administrative Center, St. Louis, MO 63155", addressed to the attention of a Lt. Col. W. T. Prescott. That letter is the basis for plaintiff's invasion of privacy claim, and is reproduced in the appendix to this opinion.

Further hearings were held on March 1 and 2, 1973, and a reply letter from Lt. Col. Prescott was submitted to the hearing officer on March 10, 1973. That letter described the general activities of plaintiff's reserve unit, and contained the following information: (1) that plaintiff is required to perform only 12 days of training per year, and Federal statutes would only require his employer to permit him to be absent that number of days; (2) that Army regulations require a reservist to notify his employer of any scheduled military training requiring him to be absent from his job; and (3) that "[t]here is nothing at hand which indicates that Colonel Beaumont has been engaged in any significant duties of a classified nature". Copies of plaintiff's orders were attached to the letter for comparison with the allegedly altered copies submitted to his employer.

The Civil Service Commission hearings officer upheld the dismissal. He ruled that plaintiff gave

insufficient notice to his employer of his upcoming absence due to reserve duty, and that plaintiff failed to make proper provisions for the supervision of his unit while he was gone. The hearings officer also found that there was no valid basis for deletion of part of plaintiff's orders, and that he did so for the purpose of keeping his employer from knowing his itinerary.

Plaintiff filed a complaint in circuit court alleging that he had incurred damages as a result of the invasion of his privacy by defendants. Specifically, plaintiff claimed that his military records were "flagged" because of the letter, resulting in an investigation of his activities by the Army. Although he was eventually cleared of all charges, plaintiff stated that he was removed from active duty training programs during the time his records were "flagged", causing him to lose active duty pay and to suffer various financial setbacks. Plaintiff also claimed damages from "embarrassment to his wife and family and the mental anxiety of defending himself as a result of the defendants' conduct".

## I. *Standard of Review*

Defendants in their motion for summary judgment alleged that the complaint "fails to state a legally sufficient claim or cause of action upon which relief can be granted". That language suggests a motion under GCR 1963, 117.2(1). However, the parties submitted affidavits concerning the issues in that motion, and the trial judge made his decision based on factors relevant only to a motion under GCR 1963, 117.2(3). Since we find that there will be no prejudice to either party, we shall treat this as a subsection (3) motion, *Todd v Biglow,* 51 Mich App 346; 214 NW2d 733 (1974), *Birch Run*

*Nursery v Jemal,* 52 Mich App 23, 24, fn 1; 216 NW2d 488 (1974), *modified,* 393 Mich 775; 224 NW2d 282 (1974).

When summary judgment is claimed under GCR 1963, 117.2(3), trial may be avoided only if an essential element of proof of the claim or defense cannot be supplied, *Rizzo v Kretchmer,* 389 Mich 363; 207 NW2d 316 (1973). The courts are liberal in finding that a genuine issue of material fact does exist, and must give the benefit of any reasonable doubt to the party opposing the motion for summary judgment, *Rizzo, supra,* 389 Mich at 372. We must decide, therefore, whether on the basis of the pleadings and affidavits, assuming that the facts asserted by plaintiff are true, an element necessary to prove the claim of invasion of privacy is clearly missing and cannot be supplied.

## II. *Invasion of Privacy in General*

Michigan has long recognized that an individual has a right to privacy to be protected by the law of torts. Prosser cites the Michigan case of *De May v Roberts,* 46 Mich 160; 9 NW 146; 41 ALR 154 (1881), as the first American case to grant relief because of an invasion of such a right. Prosser, Torts (4th ed), § 117, p 802, fn 2. In fact, it was Justice Cooley who first coined the term "the right to be let alone", Cooley, Torts (2d ed), p 29. We view invasion of privacy claims, then, as being historically recognized as necessary to protect a right of highest importance.

The courts have found it necessary to solidify these early general pronouncements on the right of privacy into specific rules. This movement was particularly in recognition of the fact that the tort of invasion of privacy overlaps with the torts of defamation and intentional infliction of mental

distress, without many of the defenses, limitations, and safeguards provided in those other areas. See Prosser, *Privacy,* 48 Cal L Rev 383, 422–423 (1960). "Invasion of privacy" as it has developed is actually a categorization of four separate causes of action:

> "The early cases in all jurisdictions were understandably preoccupied with the question whether the right of privacy existed at all, and gave little or no consideration to what it would amount to if it did. Today, with something over four hundred cases in the books, some rather definite conclusions are possible. What has emerged is no very simple matter. As it has appeared in the cases thus far decided, it is not one tort, but a complex of four. To date the law of privacy comprises four distinct kinds of invasion of four different interests of the plaintiff, which are tied together by the common name, but otherwise have almost nothing in common except that each represents an interference with the right of the plaintiff 'to be let alone.'" Prosser, Torts (4th ed), § 117, p 804.

Consequently, to recover, a plaintiff must do more than allege generally that his privacy has been invaded—he must show that the invasion complained about fits within one of the four types recognized as justifying redress.

The four types of invasions constituting the tort of invasion of privacy are as follows:

"1. Intrusion upon the plaintiff's seclusion or solitude, or into his private affairs.

"2. Public disclosure of embarrassing private facts about the plaintiff.

"3. Publicity which places the plaintiff in a false light in the public eye.

"4. Appropriation, for the defendant's advantage, of the plaintiff's name or likeness."

Prosser, *Privacy, supra,* at p 389.

Plaintiff does not allege appropriation, and that category is clearly not relevant here. Therefore, we shall consider individually the three other types of invasions of privacy for which a plaintiff may recover damages.

## III. *Intrusion*

Plaintiff alleges that the letter here intruded upon his private affairs. Intrusion as a branch of the right to privacy has three elements: (1) the existence of a secret and private subject matter; (2) a right possessed by plaintiff to keep that subject matter private; and (3) the obtaining of information about that subject matter by defendant through some method objectionable to the reasonable man. *Earp v Detroit,* 16 Mich App 271, 276–277; 167 NW2d 841 (1969), *Bradshaw v Michigan National Bank,* 39 Mich App 354, 356; 197 NW2d 531 (1972).

It is clear that this area of the right to privacy is concerned with the manner of procuring information as well as the nature of the information obtained. Prosser gives these examples of unreasonable intrusions:

"An obviously different form of invasion of privacy consists of intrusion upon the plaintiff's physical solitude or seclusion, as by invading his home or other quarters, or an illegal search of his shopping bag in a store. The principle has, however, been carried beyond such physical intrusion, and extended to eavesdropping upon private conversations by means of wire tapping and microphones; and there are decisions indicating that it is to be applied to peering into the windows of a home, as well as persistent and unwanted telephone calls." Prosser, Torts (4th ed), § 117, pp 807–808. (Footnotes omitted.)

Although plaintiff alleges that there has been an intrusion into his private life in a general sense, he does not appear to us to be claiming recovery under this type of invasion of privacy. The facts presented by plaintiff simply fail to show any improperly intrusive means employed by defendants to secure information about plaintiff. The information *given to* the Army was simply available as part of the employer-employee relationship. The information *requested from* the Army was secured by merely writing a letter. That method is not of the type covered by this cause of action, for the method itself is commonly used and quite reasonable. Plaintiff in reality objects to the allegedly false and scurrilous comments, an objection not going to the method used to secure information. Summary judgment should have been granted as to this type of invasion of privacy claim.

## IV. *Public Disclosure of Private Facts*

The elements of this second branch of invasion of privacy are obvious from its name—it was developed to avoid disclosure of embarrassing private facts to the public. The publicity requirement has been variously stated as "unnecessary publicity", *Hawley v Professional Credit Bureau, Inc,* 345 Mich 500, 507; 76 NW2d 835 (1956), and "communication * * * to the public in general or * * * to a large number of people", *Reed v Ponton,* 15 Mich App 423, 426; 166 NW2d 629 (1968). However, all the cases recognize a general requirement of communication to the general public as opposed to a few individuals, with the fine lines to be drawn on a case-by-case basis. The second requirement is satisfied if the publicity "lift[s] the curtain of privacy on a subject matter that a reasonable man

of ordinary sensibilities would find offensive and objectionable", *Reed v Ponton, supra,* at p 426.

Plaintiff in his affidavit in opposition to summary judgment does not allege disclosure to the public in general. Instead, he states that "there are 'no secrets in State government' because some one had to type the original letter, handle it, mail it and the same goes for Army employees in the various offices and headquarters receiving the letter". He goes on to aver that he learned of the letter through rumors, showing that its contents had been "leaked" through lack of security. Finally, plaintiff claims that two unsigned letters distributed to professional colleagues referred to the derogatory material contained in the original letter.

Assuming plaintiff can prove the facts he sets forth in his affidavit, an insufficient showing of public disclosure has been made out by him. Supportive personnel of the sender and receiver of a letter do not constitute the "general public" or a "large number of persons". If we held otherwise, a cause of action intended to prevent widespread disclosure of private facts could be turned against almost any two members of large organizations writing letters to each other. Proof that information in the letter was leaked to outsiders does not change the result. Plaintiff alleges that only a few persons received the leaked information. More importantly, plaintiff cites no facts which lead to a reasonable inference that defendants knew or had reason to know the letter would be passed on or even read by anyone other than Lt. Col. Prescott. Since plaintiff has failed to allege facts that would satisfy the publicity requirement, summary judgment should have been granted as to this cause of action.

It should also be noted that the facts disclosed to the Army Reserve do not seem to be "private" ones. This branch of invasion of privacy does not look to whether the information conveyed is true or false, but whether it is something an ordinary person has a right to keep private. The clear thrust of the letter is that plaintiff manipulated his reserve duty to his employer's detriment and submitted false health reports to either the Army or his employer. Those facts relate to job performance, and defendants had a right, if not a duty, to convey them to the Army. If the facts were indeed false, they would still be non-private, although another type of invasion of privacy claim may be available to redress any injuries to plaintiff.

## V. *False Light in the Public Eye*

The final branch of the tort of invasion of privacy of possible relevance here is false light. While the precise elements of this cause of action are unclear, Prosser, Torts (4th ed), § 117, pp 812–814, in general there must be falsity or fiction concerning plaintiff, with the same degree of public disclosure as required for "public disclosure of private facts". *Reed v Ponton, supra,* p 426. Commonly, this tort is found where defendants publicly falsely attribute some opinion or statement to plaintiff or use plaintiff's picture to illustrate some book or article with which he has no reasonable connection. However, it applies to any falsity, which the reasonable man would find objectionable, presented to the general public. Prosser, Torts (4th ed), § 117, p 813.

We have no problems in finding that if the statements in the letter are false they would be objectionable to the reasonable man. However, as discussed under section IV above, there is insuffi-

cient publication. Plaintiff, then, failed to make out a case sufficient to go to the jury on the "false light" theory of invasion of privacy.

## VI. *Conclusion*

We decide only that plaintiff did not allege sufficient facts in his pleadings and affidavits to allow the case to go to the jury on any recognized theory of invasion of privacy. We are not passing on any possible defamation claim arising out of this set of facts. Our opinion simply stands for the proposition that the rather narrow invasion of privacy cause of action cannot be used to right any wrongs plaintiff may have suffered through the acts of these defendants.

We do not reach the two other grounds upon which defendants based their summary judgment motion—governmental immunity and the absolute privilege with respect to statements made by public officials in the performance of their duties. Discussion of those issues are unnecessary to the result here.

Reversed and remanded, with instructions for the trial judge to enter summary judgment under GCR 1963, 117.2(3) in favor of defendants on the invasion of privacy cause of action. Costs of this appeal to defendants.

*APPENDIX*

STATE OF MICHIGAN
DEPARTMENT OF LABOR
DEPARTMENT OF LABOR BUILDING,
300 EAST MICHIGAN AVENUE
LANSING, MICHIGAN 48913

February 14, 1973

AGUC - TAD
U.S. Army Reserve Components
Personnel and Administration Center
St. Louis, MO 63155

Attention Lt. Col. W. T. Prescott

Dear Sir:

The Michigan Department of Labor has for several years been trying to deal with Mr. Robert A. Beaumont, who was considered to be an extremely disloyal and insubordinate employee.

Mr. Beaumont is a Lieutenant Colonel in the Army Reserve, assigned as a mobilization designate to G-3, 5th Army Headquarters, Fort Sam Houston, and has used his reserve status in an abusive and manipulative manner.

Through the years Mr. Beaumont has taken what we consider to be an excessive amount of time off for active duty training. He has withheld information from his employer and when pressed for justification has characterized his military status as highly secret and refused to show orders. In fact, he would not even tell us where he was assigned. It was only recently that we learned that he was assigned to 5th Army at Fort Sam Houston.

The last instance occurred in late October and

early November of this last year, when Mr. Beaumont left for a total of one month without proper advance notice to his supervisor and without making any provisions for the supervision of his unit for the period that he was to be gone.

He dropped a one week itinerary on the desk of his supervisor's secretary on his way out and had his wife bring in additional one week itineraries on the Friday of the subsequent weeks. Mr. Beaumont had told his secretary that he would be gone for a month, back for one week and then gone again for a week on military leave but not to tell his supervisors if they should ask. Upon his return Mr. Beaumont was dismissed because of abandonment of duties and dereliction of supervisory responsibilities with the Michigan Department of Labor.

One week of the month that he was gone involved the National Safety Congress in Chicago, Illinois. Mr. Beaumont had been informed that he was not to attend as a representative of the Department of Labor because frankly his prior conduct had led us to believe that he would not represent the best interests of the department. He went any way and later produced military orders for that week. Attached is a xeroxed copy of the orders that he presented to the department. As you can see dates, order numbers and other information have been blanked out. At the Civil Service hearing regarding his dismissal Mr. Beaumont presented at least two other versions of this order that appeared to have been altered. We now wonder if the orders are official at all and if so to what extent they have been altered by Mr. Beaumont. We would greatly appreciate your verification concerning the authenticity of the orders and if possible providing us with a copy of the original.

In 1972 alone, Mr. Beaumont has claimed a total of 32 days of active duty training. There has been a total of 54 days that we can identify since 1969. There may have been more but we cannot determine because he has on occasion used annual leave days for military purposes. It would. be greatly appreciated if you could verify whether or not he actually had orders for the following dates:

1969—May 5 through 16
1970—May 4 through 15
1971—September 23 and 24
1972—April 12 through 21
      July 31 through August 2
      September 21 and 22
      October 24 through 27
      October 30 through November 3
      November 6 through 17

Mr. Beaumont made a number of statements concerning military procedures and policies at the Civil Service hearing which I have reason to question. The Civil Service hearing will be continued on March 1, 1973, and because I anticipate that Mr. Beaumont will give further testimony on military policy or may even bring a witness who he may try to characterize as a military expert, we would very much like to receive in writing the official U.S. Army Reserve policy concerning active duty training requirements. Are there minimum or maximum days of training required? Are they scheduled at precise times or is there flexibility in scheduling? What is the reporting responsibility of the reservist to his employer? What is the obligation of the employer in agreeing to precise times and dates requested for required training days? Are we required to approve additional days beyond the annual requirement?

Mr. Beaumont would have us believe that he has

no control over the scheduling of his duty training and has no advance notice as in the instance of the last situation of an entire month that he only knew one week at a time that he would be gone.

I think that you can recognize from the above the kind of problem that we have been having with this man and the kind of information that we need in order to defend our action against him. We are not experts on military matters here in the Department of Labor nor do we have any need to be and that is why we are coming to you, the experts, for advice.

The Department of Labor employs many veterans, reservists and members of the National Guards. As part of our personnel philosophy we recognize and safeguard the employment rights of military personnel. We have always tried to be cooperative with the employee and the military in the scheduling of the duty training. We have never had any problem with any other employee except Mr. Beaumont. All of the others seem to have plenty of advance notice and can give us time to adjust schedules and work loads in order to accommodate their training requirements without disrupting the orderly operation of the department. Only Mr. Beaumont disappears for a month at a time and later tells us that he was on military leave and that his duty is so secret and delicate that he cannot discuss it.

One other technique used by Mr. Beaumont when he chooses not to take direction or follow instructions, concerns his health. Although this item has nothing to do with the dismissal I think it significant enough to mention. Mr. Beaumont has presented statements from various doctors to require that he be allowed to travel in his air conditioned Mercedes rather than in a state car. He is unable

to fly; he is unable to get up early; he is unable to go into dirty or dusty industrial establishments, etc. We have even received statements that his condition is so delicate that he could keel over at anytime. It would lead us to wonder how an individual with such delicate health could pass any army physical to remain in the reserves.

As I have already mentioned the Civil Service hearing will be continued on March 1, 1973, and I would greatly appreciate receiving your reply prior to that date if at all possible.

Thank you for your assistance.

Sincerely,


s/Arthur J. Zink
Personnel Director